Slip Op. 08-114

## UNITED STATES COURT OF INTERNATIONAL TRADE

Before: Nicholas Tsoucalas, Senior Judge

```
_____
LONGKOU HAIMENG MACHINERY CO., LTD.,    :
LAIZHOU AUTO BRAKE EQUIPMENT COMPANY,    :
LAIZHOU HONGDA AUTO REPLACEMENT          :
PARTS CO., LTD.,                         :
LAIZHOU LUQI MACHINERY CO., LTD.,        :
QINGDAO GREN (GROUP) CO., and            :
LONGKOU TLC MACHINERY CO., LTD.,         :
                                         :
         Plaintiffs,                     : Consolidated
                                         : Court No.:  07-00321
                                         :
         v.                              :
                                         :
UNITED STATES OF AMERICA,                :
                                         :
         Defendant,                      :
                                         :
         and                             :
                                         :
COALITION FOR THE PRESERVATION OF        :
AMERICAN BRAKE DRUM AND ROTOR            :
AFTERMARKET MANUFACTURERS                :
                                         :
         Defendant-Intervenor.           :
_____:
```

October 21, 2008

**Held:** The United States Department of Commerce's Final Determination is sustained in part and remanded in part.

Trade Pacific PLLC, (Robert G. Gosselink; Jonathan Michael Freed) for Longkou Haimeng Machinery Co., Ltd.; Laizhou Auto Brake Equipment Company; Laizhou Hongda Auto Replacement Parts Co., Ltd.; Laizhou Luqi Machinery Co., Ltd.; and Qingdao Gren (Group) Co., Plaintiffs.

Venable LLP, (Lindsay Beardsworth Meyer) for Longkou TLC Machinery Co. Ltd., Plaintiff.

Gregory G. Katsas, Assistant Attorney General, Commercial

Litigation Branch, Civil Division, United States Department of
Justice; <u>Jeanne Davidson</u>, Director, Commercial Litigation Branch,
Civil Division, United States Department of Justice; <u>Patricia M.
McCarthy</u>; Assistant Director, Commercial Litigation Branch, Civil
Division, United States Department of Justice; <u>Courtney Sheehan</u>,
Trial Attorney, Commercial Litigation Branch, Civil Division,
United States Department of Justice; <u>Melanie A. Frank</u>, Office of
Chief Counsel for Import Administration, United States Department
of Commerce; <u>Stephen Carl Tosini</u>, Commercial Litigation Branch,
Civil Division, United States Department of Justice, for the United
States, Defendant.

<u>Porter, Wright, Morris & Arthur, LLP</u>, (<u>Renata Brandao Vasconcellos</u>)
for The Coalition for the Preservation of American Brake Drum and
Rotor Aftermarket Manufacturers, Defendant-Intervenor.

## OPINION

**TSOUCALAS, Senior Judge:** This matter is before the Court on a
motion for judgment upon the agency record brought by the
Plaintiffs pursuant to USCIT Rule 56.2.

Plaintiffs challenge numerous aspects of the U.S. Department
of Commerce's ("Commerce's") final determination with respect to
the ninth administrative review of the antidumping order in <u>Brake
Rotors From the People's Republic of China: Final Results of
Antidumping Duty Administrative and New Shipper Reviews and Partial
Rescission of the 2005-2006 Administrative Review</u>, 72 Fed. Reg.
42,386 (Aug. 2, 2007) Public Record Doc. No. 209 ("<u>Final
Results</u>").[1] Plaintiffs contend that certain aspects of Commerce's

---

[1]  Hereinafter all documents in the confidential record will
be designated "CR," and all documents in the public record
designated "PR."

determination is contrary to law, constitutes an abuse of discretion and is not supported by substantial evidence on the record.  <u>See</u> Pls.' R. 56.2 Mot. J. Upon Agency Rec. ("Pls.' Brief.").  For the reasons set forth below, the Court sustains the <u>Final Results</u> in part, and remands it in part.


## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) and 28 U.S.C. § 1581(c).


## STANDARD OF REVIEW

When reviewing the final results in antidumping administrative reviews "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more than a mere scintilla."  <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Huaiyin Foreign Trade Corp. (30) v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting <u>Consol. Edison Co.</u>, 305 U.S. at 229).  In determining the existence of substantial evidence, a reviewing Court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts

from the substantiality of the evidence.'" <u>Huaiyin</u>, 322 F.3d at 1374 (quoting <u>Atl. Sugar, Ltd. v. United States</u>, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).   The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.   <u>See</u> <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. 607, 620 (1966) (citations omitted).

## BACKGROUND

Longkou Haimeng Machinery Co., Ltd. ("Haimeng"); Laizhou Auto Brake Equipment Company ("LABEC"); Laizhou Hongda Auto Replacement Parts Co., Ltd. ("Hongda"); Laizhou Luqi Machinery Co., Ltd. ("Luqi"); Qingdao Gren (Group) Co. ("Gren") (collectively "Haimeng Plaintiffs") and plaintiff Longkou TLC Machinery Co., Ltd. ("TLC") contest aspects of Commerce's final determination.   Plaintiffs are producers and exporters of brake rotors subject to the antidumping duty order on <u>Brake Rotors from the People's Republic of China</u> ("subject merchandise") during the ninth administrative review. <u>See</u> <u>Final Results</u>, 72 Fed. Reg. 42,386.

On April 3, 2006, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order of brake rotors from the People's Republic of China ("PRC") for the period April 1, 2005 through March 31, 2006 ("the period of review" or "POR").   <u>See</u> <u>Antidumping or Countervailing Duty Order, Finding,</u>

or Suspended Investigation; Opportunity to Request Administrative
Review, 71 Fed. Reg. 16,549 (Apr. 3, 2006).  In conformance with
agency regulations, Commerce received timely requests for an
administrative review of the antidumping duty order in question.
On May 31, 2006, Commerce initiated the ninth administrative review
of brake rotors from China for twenty-seven individually named
firms.  See Notice of Initiation of Antidumping and Countervailing
Duty Administrative Reviews and Request for Revocation in Part , 71
Fed. Reg. 30,864 (May 31, 2006) (PR 5).

On June 16, 2006, Commerce notified all interested parties
that "[d]ue to the large number of requests for administrative
review and the Department's experience regarding the resulting
administrative burden to review each company for which a request
has been made, the Department is considering exercising its
authority to select respondents," and requested that each company
subject to this administrative review submit certain company-
specific information.  Letter to All Interested Parties (June 16,
2006), (PR 10).  In response, Commerce received timely submissions
of the requested quantity and value data for all of the plaintiffs
involved.  See Letters from Trade Pacific PLLC, (July 6, 2006), (CR
8, 9, 10, 11, 16); Letter from Venable LLP,(June 30, 2006), (PR
19).

Of the twenty seven companies for which a review was
originally initiated, Commerce received seven requests for

rescission of review based on claims that the companies did not have shipments of subject merchandise during the POR.  See Brake Rotors From the People's Republic of China: Preliminary Results of the 2005-2006 Administrative and New Shipper Reviews and Partial Rescission of the 2005-2006 Administrative Review, 72 Fed. Reg. 7,405 (Feb. 15, 2007) (PR 182) ("Preliminary Results").  In addition, Commerce determined that certain other separately listed companies were to be considered the same entity for purposes of this administrative review.[2]  See Antidumping Duty Administrative Review of Brake Rotors from the People's Republic of China: Selection of Respondents, (Aug. 18, 2006) (PR 51) ("Respondent Selection Memorandum").

Two of the remaining seventeen companies, Qindao Rotec Auto Parts Co., Ltd. ("Rotec") and Xiangfen Hengtai Brake System Co. Ltd. ("Hengtai"), did not respond to Commerce's request for quantity and value information.  Because these companies did not submit any information to establish their eligibility for a separate rate, Commerce determined that they did not qualify for a separate rate analysis, and were considered to be part of the PRC-

---

[2]  Commerce previously determined that Laizhou Auto Brake Equipment Co., Ltd. is the successor-in-interest to Laizhou Auto Brake Equipments Factory; Shangdong Huanri Group Co., Ltd. is the successor-in-interest to Shangdong Huanri Group General Co.; and Laizhou Huanri Automobile Co., Ltd. is part of the Shangdong Huanri Group General Co. Thus, seventeen of the original twenty seven companies remained. See Preliminary Results, 72 Fed. Reg. 7,405, 7,406.

wide entity.  Thus, both Rotec and Hengtai were assigned the China country-wide rate.[3]

On August 18, 2006, based on a review of the quantity and value data for the remaining fifteen companies, Commerce issued its Respondent Selection Memorandum.  Relying on section 777A(c)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(c)(2), Commerce decided to exercise its statutory authority to limit its examination of respondents in calculating individual dumping margins.  See Respondent Selection Memorandum, (Aug. 18, 2006) (PR 51).  Commerce based its decision to restrict the respondent pool on the ground that it lacked the administrative resources to effectively examine all of the exporters-producers involved.  See id. at 3.

Commerce then informed the interested parties that, pursuant to 19 U.S.C. §1677f-1(c)(2)(B), it would employ a sampling method based on those respondents accounting for the largest volume of subject merchandise exported or produced.  See id. at 4. Consequently, three companies cumulatively accounting for more than fifty two percent of the exports of brake rotors from the PRC were

---

[3]  Where an interested party has failed to cooperate to the best of its ability with a request for information, Commerce may resort to the use of facts available with an adverse inference. See 19 U.S.C. §1677e(b).

chosen as mandatory respondents.[4]  In addition, Commerce indicated that in the event "a mandatory respondent fails to participate, and companies that wish to be treated as voluntary respondents have submitted timely responses, we may at our discretion . . . select a voluntary respondent for individual review." Id. at 4.  Commerce further explained that to be selected as a voluntary respondent: (1) the respondent must have met filing deadlines for information requested (and otherwise comply with all other Department deadlines); (2) if there is more than one potential voluntary respondent, Commerce would select the respondent based on the order of each company's submission of voluntary respondent review; and (3) once selected, a voluntary respondent would be subject to the same requirements as mandatory respondents, including the use of facts available under 19 U.S.C. § 1677e.  See id. at 4-5.

On October 2 and October 3, 2006, respectively, both Hongda and Luqi submitted voluntary response questionnaires to Commerce, and requested that company specific antidumping margins be calculated.  See Hongda Voluntary Response, (Oct. 2, 2006) (CR 43); Luqi Voluntary Response, (Oct. 3, 2006) (CR 44).

In the preliminary results, mandatory respondents Winhere and

---

[4]  Among the three companies chosen was Plaintiff Haimeng. The remaining two companies included Yantai Winhere Auto-Part Manufacturing Co. Ltd. ("Winhere") and Qingdao Meita Automotive Industry Co. Ltd. ("Meita"). Plaintiffs LABEC, Hongda, Luqi, Gren, and TLC were not among those selected for review.

Meita received zero or <u>de minimis</u> antidumping margins, and Haimeng,
the third mandatory respondent, received a rate of 3.43 percent.
<u>See</u> <u>Preliminary Results</u>, 72 Fed. Reg. 7,405, 7,415.  Furthermore,
Commerce concluded that each of the remaining fifteen companies
involved in the proceeding were eligible for a "separate rate"
calculation.[5]  <u>See</u> <u>id.</u> at 7,408.  Therefore, the twelve non-
selected respondents were assigned an "all-others" rate consistent
with 19 U.S.C. § 1673d(c)(5).  This rate is based on the weighted
average of the calculated margins of the mandatory respondents,
excluding any zero and <u>de minimis</u> margins, or margins based
entirely on facts available.  <u>See</u> 19 U.S.C. § 1673d(c)(5)(A);
Separate Rate Analysis for Respondents (Including Exporters Not
Individually Reviewed) at 3 (Feb. 9, 2007), (PR 178).  Because
Winhere and Meita's zero and <u>de minimis</u> margins were excluded from
the calculations, the non-selected respondents were assigned
Haimeng's rate of 3.43 percent.  Commerce did not calculate
company-specific margins based on Hongda and Luqi's voluntary
responses.

    For purposes of valuing the factors of production in the

---

    [5]  In proceedings involving non-market economy ("NME")
countries, Commerce employs a rebuttable presumption of state
control, and assigns the exporter a country-wide antidumping duty
rate. In order to rebut this presumption and qualify for a
separate, company-specific rate, an exporter must demonstrate
that it is sufficiently independent of government control. <u>See</u>
<u>Sigma Corp. v. United States</u>, 117 F.3d 1401, 1405 (Fed. Cir.
1997).

calculation of normal value, Commerce relied on Indian import statistics of pig iron as reported in the World Trade Atlas ("WTA").  See Preliminary Results, 72 Fed. Reg. 7,405 (PR 182). Following the Preliminary Results, Haimeng Plaintiffs submitted data from Infodrive India in an effort to provide "more detailed information regarding imports of pig iron into India during the POR."  Pls.' Brief at 4.  Hongda and Luqi also submitted U.S. sales and factors of production data "for Commerce to use to calculate company-specific antidumping margins."  Id. at 13.

On August 2, 2007, Commerce issued its final determination in which it made certain changes to the antidumping duties assessed in the preliminary findings.[6]  See Final Results, 72 Fed. Reg. 42,386 (Aug. 2, 2007).  As it did in its Preliminary Results, Commerce assessed a dumping margin based upon the weighted average of the dumping margins of the three mandatory respondents, exclusive of any zero and de minimis assignments (i.e., Winhere and Meita).  See Issues and Decision Memorandum for the 2005-2006 Administrative and New Shipper Reviews of the Antidumping Duty Order on Brake Rotors From the People's Republic of China at 25, cmt. 8 ("Issues and Decision Memorandum") (PR 211).  In addition, Commerce  continued

---

[6]  In the Final Results, both Winhere and Meita continued to receive zero and de minimis margins respectively, whereas Haimeng's antidumping duty rate was changed from 3.43 to 4.22. Thus, the separate rate for all non-selected respondents was increased to 4.22 as well. See 72 Fed. Reg. at 42,388.

to value Plaintiffs' consumption of pig iron using only data provided by the WTA, and declined to consider the additional information submitted by Plaintiffs. <u>See</u> <u>id.</u> at 6, cmt. 1.

Plaintiffs commenced this action on August 31, 2007.[7] Plaintiffs seek judgment on the agency record under USCIT Rule 56.2 with respect to the following four issues:

> 1. Whether Commerce's decision not to calculate company-specific dumping margins for all voluntary respondents is unsupported by substantial evidence, or otherwise not in accordance with law;

> 2. Whether Commerce's decision not to consider Plaintiff's U.S. sales and factors of production data in the calculation of dumping rates assigned to the non-selected respondents is unsupported by substantial evidence, or otherwise not in accordance with law;

> 3. Whether Commerce's decision not to incorporate the zero and <u>de</u> <u>minimis</u> margins of the mandatory respondents into the average rate assigned to the non-selected respondents is arbitrary, capricious or an abuse of discretion; and

> 4. Whether the methodology employed by Commerce in the valuation of pig iron as a factor of production is unsupported by substantial evidence.

## Discussion

**I.   Commerce's Decision Not to Calculate Company-Specific Dumping Margins For All Voluntary Respondents Is Supported By Substantial Evidence And In Accordance With Law.**

**a.   Commerce's Decision Is In Accordance With Law**

---

[7] This date reflects the initiation of two separate actions, one carried under case number 07-00321, and the other under case number 07-00333. Both actions were consolidated under the former, pursuant to USCIT Rule 42(a), on October 19, 2007.

In challenging Commerce's decision not to calculate company-specific margins, Plaintiffs contend that Commerce must accept voluntary respondents when the agency limits the number of mandatory respondents examined in an administrative review.  <u>See</u> Pls.' Brief at 7-8.  Plaintiffs argue that under the plain meaning of the statute they are entitled to an individual weighted average dumping margin.  Though Plaintiffs acknowledge Commerce's authority to limit its review of mandatory respondents, pursuant to 19 U.S.C. § 1677f-1(c)(2)(B), they maintain that the inclusion of section 1677m(a) (voluntary respondents) was intentional, and is proof of Congress' intent to provide recourse to those companies not selected for mandatory review.  <u>See</u> Pls.' Brief at 7.

Specifically, Plaintiffs point to the language of the statute itself as evidence that it is not subject to administrative interpretation by Commerce.  <u>See</u> <u>id.</u> at 8.  19 U.S.C. § 1677m reads in pertinent part:

> (a) Treatment of voluntary responses in countervailing or antidumping duty investigations and reviews
>
> > In any investigation . . . or a review . . . in which the administering authority has, under section 1677f-1(c)(2) . . . limited the number of exporters or producers examined, . . . the administering authority <u>shall</u> establish . . . an individual weighted average dumping margin for any exporter or producer not initially selected for individual examination under such sections who submits to the administering authority the information requested from exporters or producers selected for examination, if-

> (1) such information is so submitted by the date specified-
>
>      . . . and
>
> (2) the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation. (emphasis added).

Plaintiffs contend that because the statutory language is mandatory, i.e., "shall," Commerce violated its express mandate to calculate an individual dumping margin when it refused to accept the voluntary responses submitted by Hongda and Luqi. Pls.' Brief at 8. While acknowledging the exception in paragraph (2), Plaintiffs reject Commerce's reliance on this provision, as not supported by substantial evidence. See id.

Commerce responds that although the applicable statutory scheme establishes a preference for individual reviews, it specifically includes exceptions in two separate provisions that provide Commerce with broad discretion to limit the number of respondents it chooses to examine. See Def.'s Resp. in Opp'n to Pls.' Mot. for J. Upon the Agency R. ("Def.'s Brief") at 10. Commerce first points to 19 U.S.C. § 1677f-1(c)(2) which provides the agency with the authority to limit the number of reviews it conducts when it is "not practicable" to examine all known producers or exporters of subject merchandise. 19 U.S.C. § 1677f-

1(c)(2); see also Def.'s Brief at 10.  More specifically, Commerce

may limit its review by examining either:

> (A) a sample of exporters, producers, or types of
> products that is statistically valid based on the
> information available to the administering authority at
> the time of selection, or
>
> (B) exporters and producers accounting for the largest
> volume of the subject merchandise from the exporting
> country that can be reasonably examined.

19 U.S.C. § 1677f-1(c)(2).  Commerce further argues that section

1677m reaffirms its discretionary power to restrict the number of

voluntary respondents it reviews if the number of companies

submitting requests would impose an undue burden, or inhibit the

timely completion of the investigation.  See 19 U.S.C. §

1677m(a)(2); Def.'s Brief at 10-11.

Plaintiffs rely on the statute to advance the argument that

Commerce is required to "establish an individual dumping margin for

any exporter or producer that submits voluntary responses and

requests an individual margin." Pls.' Brief at 7.  At first blush,

it would appear that the core of Plaintiffs' challenge in this

regard focuses on the proper construction of 19 U.S.C. § 1677m(a).

On the other hand, Plaintiffs concede that the same provision,

which forms the basis for this argument, also provides an exception

to this mandate.  See id.  Perhaps anticipating the incongruity of

this position, Plaintiffs argue in the alternative that "[i]t is

not plausible that Congress intended or expected 'two' to be a

particularly high number." Id. at 8.  Therefore, Plaintiffs allege

that "[b]ecause the number of voluntary respondents was not large,

Commerce should have calculated individual weighted-average dumping

margins for both voluntary respondents: Hongda and Luqi." Id.

     Neither argument persuades the Court as the statute and the

legislative history are clear on this point.  The provisions in

sections 1677m(a) and 1677f-1(c)(2) are clear expressions of

Commerce's statutory authority to limit the number of respondents

it chooses to review.  Moreover, Congress recognized both the

impracticality and impracticability of examining all producers and

exporters in all cases, and explained in its Statement of

Administrative Action  accompanying the Uruguay Round Agreements

Act ("URAA"), that:

> As a practical matter . . . Commerce may not be able to
> examine all exporters and producers, for example, when
> there is a large number of exporters and producers.
> Statement of Administrative Action, H.R. 5110 (H.R. Doc.
> No. 103-316) at 872 (1994) ("SAA"), reprinted in 1994
> U.S.C.C.A.N. 4040, 4200.

Indeed, Congress was not only aware of the administrative burden

such a condition would impose, but more to the point, it

specifically rejected the notion of an examination requirement for

all exporters or producers.  While acknowledging attempts by other

contracting parties to negotiate this stipulation into the URAA,

Congress made clear that these attempts were unsuccessful.

     During the Uruguay Round negotiations, certain countries

> sought a requirement that national authorities examine *all* firms producing or exporting a product subject to an antidumping investigation. . . As negotiated, Articles 6.10 and 9.4 of the Antidumping Agreement largely reflect existing U.S. law and practice. <u>Id.</u>

In making the determination as to whether Commerce's interpretation and application of the antidumping statute is in accordance with law, a Court must undertake the two step analysis prescribed by <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984) ("<u>Chevron</u>"). <u>See</u> <u>Windmill Int'l Pte. v. United States</u>, 26 CIT 221, 222, 193 F. Supp. 2d 1303, 1305 (2002). Under the first step, the Court reviews Commerce's construction of a statutory provision to determine whether Congress has spoken on point as to the question at issue. <u>See</u> <u>id.</u> at 223, 193 F. Supp. 2d at 1305. It is clear from the language of the SAA and the statute itself, that Congress has spoken on the matter. The authority to limit the number of respondents for examination rests "exclusively" with Commerce. SAA, H.R. 5110 (H. Doc. No. 103-316) at 872; <u>see also</u> 19 U.S.C. § 1677f-1(c)(2). Therefore, the Court finds that Commerce's determination to limit its review to three mandatory respondents was within the bounds of its statutory authority.

### b.   Commerce's Decision Is Supported By Substantial Evidence

In the alternate, Plaintiffs point to Congress' declaration in the SAA that Commerce should decline to examine voluntary respondents only "'where the number of exporters or producers is

particularly high,'" and that "[b]ecause the number of voluntary respondents was not large, Commerce should have calculated individual weighted-average dumping margins for both voluntary respondents: Hongda and Luqi."[8]  Pls.' Brief at 8; see also SAA, H.R. 5110 (H.R. Doc. No. 103-316) at 873.  Plaintiffs contend that it is unreasonable to suggest that Congress envisaged a circumstance in which only two companies would sufficiently tax the resources of Commerce so as to place an undue burden on its ability to conduct reviews.  Pls.' Brief at 8.

In support of this argument Plaintiffs cite to the record of the underlying antidumping order. Both of the voluntary respondents in the instant matter, were also respondents in several previous administrative reviews.  See Pls.' Brief at 10.  In each instance where Hongda and Luqi were afforded separate company-specific margins, Commerce determined that neither company was dumping.  See id. Thus, according to Plaintiffs, Commerce was familiar with both companies, and this familiarity would serve to negate any undue burden posed by Plaintiffs' voluntary submissions.  See id. Moreover, Plaintiffs point to instances in certain previous administrative reviews where Commerce was able to examine either all of the companies involved, or at a minimum, a number greater

---

[8]  Originally, there were three voluntary respondents, Hongda, Luqi and LABEC, however, only Hongda and Luqi challenge Commerce's determinations on this issue.

than the three performed in the current proceeding.[9]  See id. at
11.  Thus, Plaintiffs allege, because Commerce exhibited an ability
on these prior occasions to review a greater number of respondents,
Commerce's decision to review only three companies in the
underlying proceeding is arbitrary and without justification. See
id. Plaintiffs further suggest that if Commerce extended the
deadline for completing its final results, as was permitted under
the statute, it would have been able to examine both voluntary
respondents. See id. at 12.

     Plaintiffs logic in this regard is flawed.  First, any
assessment of Commerce's operational capabilities or deadline
rendering must be made by the agency itself.  As the United States
Court of Appeals for the Federal Circuit ("CAFC") has already
explained, "agencies with statutory enforcement responsibilities
enjoy broad discretion in allocating investigative and enforcement
resources." Torrington v. United States, 68 F. 3d 1347, 1351 (Fed.
Cir. 1995).  To find otherwise would put this Court in the position
of routinely second-guessing Commerce's decisions regarding its own
administrative capacity. See id. This is "a role for which courts
are ill-suited and one that could be quite disruptive of Commerce's

---

     [9]  Prior to the eighth administrative review of brake rotors
from the PRC, Commerce examined every exporter or producer of
subject merchandise requesting such a review. See Pls.' Brief at
11. During the eighth administrative review, Commerce limited the
number of respondents to five utilizing a sampling methodology.
See id.

effort to establish enforcement priorities." <u>Id.</u>

Second, the fact that Commerce was able to review a larger number of respondents in previous administrative reviews has no bearing on whether or not the agency has sufficient resources in any subsequent proceeding.  At most, all that these prior reviews establish is a consistent adherence to the statutory preference of individual weighted average dumping margins.  A strict adherence to one part of the statutory scheme does not detract from Commerce's authority to invoke another part of its statutory prerogative.

Third, the Court disagrees with Plaintiffs' contention that the acceptance of voluntary respondents would not have significantly increased Commerce's administrative burden.  While conducting an administrative review of an antidumping duty order Commerce is charged with a number of different tasks.  For example, the analysis of each company's response, the collection and analysis of surrogate value data for each unique part used by each respondent, and performing the margin calculations for each respondent all require the expenditure of significant resources. <u>See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China</u>, 69 Fed. Reg. 20,594, cmt. 2 (Dep't of Commerce) (Apr. 16, 2004) and accompanying Issues and Decision Memorandum.  Moreover, the Court notes that even if Commerce determined that it had the resources to

review two additional companies, it would not have selected either of the two voluntary respondents, because based on the respondent selection methodology, neither Hongda nor Luqi had the next largest export sales volume. <u>See</u> Respondent Selection Memorandum, (August 18, 2006) (CR 19).

Lastly, Plaintiffs maintain that Commerce has "failed to offer any evidence to support its claim that reviewing more than three companies would have created an undue burden" Pls.' Brief at 11. The record, however, does not support Plaintiffs position on this point. In fact, there is evidence to the contrary showing that Commerce conducted a careful evaluation of its resource capabilities. <u>See</u> Respondent Selection Memorandum, (August 18, 2006) (PR 51). Specifically, Commerce examined the number of cases, respondents, and analysts it had at its disposal, and determined that it did not have sufficient resources to conduct a comprehensive analysis of all the interested parties. <u>See</u> <u>id.</u> at 3. Commerce explained that:

> "[t]his office is conducting numerous concurrent antidumping proceedings which place a constraint on the number of analysts that can be assigned to this case. Not only do these other cases present a significant workload, but the deadlines for a number of the cases coincide and/or overlap with deadlines in this antidumping proceeding. In addition, because of the significant workload throughout the Import Administration, we do not anticipate receiving any additional resources to devote to this antidumping proceeding." <u>Id.</u>

Thus, Commerce demonstrated that it carefully considered all

available options, and concluded that the most efficient use of its
resources was to limit the number of respondents it examined.

     The specific determination a court makes in the substantial
evidence standard of review is "'whether the evidence and
reasonable inferences from the record support the finding.'" <u>Daewoo
Elecs. v. Int'l Union</u>, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (citing
<u>Matsushita Elec. Indus. Co., Ltd. v. United States</u>, 750 F.2d 927,
933 (Fed. Cir. 1984)).  This standard has been easily met here, and
the Court finds that Commerce's decision to limit its review in
this proceeding to the three mandatory respondents is reasonable,
and supported by substantial evidence.


**II.  Commerce's Decision Not to Consider Plaintiffs' U.S. Sales And
     Factors of Production Data In The Calculation Of Dumping
     Margins Assigned to the Non-Selected Respondents Is Supported
     By Substantial Evidence And In Conformance With Law**

     **a.   Commerce's Decision Is In Accordance With Law**

     In determining the rate to be applied to the non-selected
respondents, Commerce assigned the non-selected, cooperative
respondents a weighted-average percent margin based on the
calculated margins of the mandatory respondents, exclusive of any
zero or <u>de</u> <u>minimis</u> rates or rates based entirely on facts
available.  <u>See</u> Def.'s Brief at 6; <u>see also</u> 19 U.S.C. §
1673d(c)(5)(A).  Haimeng Plaintiffs challenge Commerce's reliance
on this "all-others" methodology arguing that the record evidence

demonstrates that this rate is not representative of the companies'
actual level of dumping.  See Pls.' Brief at 13.  Rather,
Plaintiffs contend that Commerce should not have relied on the
margins assigned to the mandatory respondents, but instead used the
U.S. sales and factors of production data submitted by Hongda, and
Luqi to calculate company-specific margins.[10]  See id.  Accordingly,
Plaintiffs allege that the rate "Commerce assigned to Hongda, Luqi,
and Gren was contrary to law because these companies submitted
information to Commerce that demonstrates that the average rate
assigned to them is not representative of their actual level of
dumping."  Pls.' Brief at 13.

Plaintiffs rely on 19 U.S.C. § 1677m(e) for the proposition
that such an approach is consistent with the statutory goal of
establishing the most accurate antidumping margins possible.  The
statute reads as follows:

> In reaching a determination under section 1671b, 1671d,
> 1673b, 1673d, 1675, or 1675b of this title the
> administering authority and the Commission shall not
> decline to consider information that is submitted by an
> interested party and is necessary to the determination
> but does not meet all the applicable requirements
> established by the administering authority or the
> Commission, if-

---

[10]  Plaintiffs challenging this portion of Commerce's
decision include Hongda, Luqi, Gren and TLC. While Hongda and
Luqi rely on their U.S. sales and factors of production data and
TLC on its voluntary response data, Gren relies solely on the
quality and value information it submitted at the commencement of
the proceeding.

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

(5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).[11]  Plaintiffs assert that Hongda and Luqi submitted timely responses within the required deadline, and the information was otherwise in accord with section 1677m(e).[12]  In addition, Plaintiffs maintain that although they were not selected for review, Commerce should have nevertheless relied upon their respective data submissions for purposes of calculating company-specific antidumping margins.

_____

[11]  Plaintiffs similarly rely on Commerce's own regulations which state in part that, "the Secretary will not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the Secretary if the conditions listed under section 782(e) of the Act are met." 19 C.F.R. §351.308(e).

[12]  Hongda and Luqi calculated their own dumping margins using the data they submitted to Commerce. These self executed margin calculations resulted in zero or de minimis dumping rates for Hongda and Luqi. See Pls.' Brief at 14.

Once again Plaintiffs' logic is flawed.  As Commerce accurately restates the argument, "Plaintiffs . . . suggest that [section] 1677m(e) (the requirement to consider certain deficient submissions) trumps the exception provided in section 1677m(a)(2) (the exception for calculating individual margins for voluntary respondents where doing so would be unduly burdensome)."  Def.'s Brief at 23.  In the first instance, the Court agrees with Commerce that section 1677m(e) is applicable only on those occasions where such information submitted by interested parties does not meet certain requirements established by Commerce.  Commerce's denial of Plaintiffs' data submissions was based not on a failure to meet applicable requirements, but rather on the status of its administrative capabilities.  Therefore, this provision is inapposite for purposes of this proceeding.  See Def.'s Brief at 22.  In the second instance, the statute directs Commerce to consider such information only if "the information can be used without undue difficulties."  19 U.S.C. § 1677m(e)(5).  Commerce explained in its Issues and Decision Memorandum, that agency resource constraints were such that it could only examine three respondents in this administrative review.  See Issues and Decision Memorandum at 22, cmt. 6 (PR 211).  Having already found that Commerce is in the best position to assess its own administrative capabilities, the Court agrees with Commerce that even if section 1677m(e) were to apply here it would not require consideration of

Plaintiffs' questionnaire responses.

To give effect to Plaintiffs' understanding that section 1677m(e) defeats the relevant portions of section 1677m(a) would be to render nugatory Commerce's statutory authority to limit the number of respondents it reviews in any given proceeding.  One of the basic rules of statutory construction is that "[a] statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent.  Consequently, each part or section should be construed in connection with every other part or section to produce a harmonious whole."  Norman J. Singer, 2A Sutherland Stat. Const., § 46:5 (7th ed. 2007).  The exceptions set forth in both sections 1677m(a)(2) and 1677m(e)(5) are clear expressions by Congress conferring the authority upon Commerce to decline acceptance of company-specific submissions when those reviews would create either an "undue burden" or "undue difficulties."  These provisions are neither in conflict with each other, nor with the statute as a whole.

The Court finds that Commerce's decision not to consider the Plaintiffs' data submissions was a proper exercise of its authority and in accordance with the clear language of the statute.

### b.   Commerce's Decision Is Supported By Substantial Evidence

Although briefly mentioning the phrase "substantial evidence" the Plaintiffs do not put forth any argument claiming that Commerce's determination itself was not supported by substantial

evidence.  <u>See</u> Pls.'Brief at 15 ("The information provided showed
that the companies were not dumping at the level calculated for
Haimeng, and Commerce's decision to ignore the record evidence and
to assign Haimeng's rate to these companies was not supported by
substantial evidence."); <u>contra</u> Def.'s Brief at 21 ("Commerce's
reliance upon the rate it calculated and verified during the course
of the administrative review was supported by substantial
evidence.").  Rather, their argument centers primarily upon whether
the rate applied by Commerce to the non-selected respondents was
based on the best available information.  Plaintiffs rely on this
Court's decision in <u>Yantai Oriental Juice Co., v. United States</u>,
stating that Commerce "must insure that any methodology it employs
in any particular investigation 'is based on the best available
information and establishes antidumping margins as accurately as
possible.'" 27 CIT 477, 487, (2003) (citing <u>Shakeproof Assembly
Components, Div. of Ill. Tool Works, Inc. v. United States</u>, 268
F.3d 1376, 1382 (Fed. Cir. 2001)).  Plaintiffs argue that "[g]iven
the information Plaintiffs provided to Commerce in the underlying
proceeding, . . . and given Commerce's failure to use or even admit
the existence of this information, Commerce did not rely on the
best available information or establish antidumping margins as
accurately as possible." Pls.' Brief at 14-15 (internal quotation
marks omitted).

      Plaintiffs reliance on this Court's decision in <u>Yantai</u> is

specious.  The circumstances in that decision are not analogous to those present in the case at bar.  Yantai involved a remand determination whereby Commerce abandoned the methodology used in its final results when calculating a new all-others rate for non-selected respondents.  In so doing, Commerce failed to justify the use of the latter methodology, and was unable to make a "rational connection" between the facts found and its new approach.  Yantai, 27 CIT at 488.  In the underlying administrative review, however, Plaintiffs do not contest Commerce's reliance on the largest exporter by volume methodology.  Instead, Plaintiffs maintain that Commerce erred in declining to review the information they submitted in their questionnaire responses, and failing to assign Plaintiffs company-specific margins.  In other words, Plaintiffs request removal from the effects of the sampling methodology altogether.  While this is framed as a substantial evidence argument, it sounds dissonantly familiar to Plaintiffs' assertion that Commerce is required to calculate company-specific margins because the statute requires them to do so - an argument the Court has addressed supra.  Because Plaintiffs sporadically include the phrase "substantial evidence" with regard to this point, the Court summarily addresses the issue.  As demonstrated supra, Commerce pointed to substantial record evidence and explained its decision to limit the number of respondents the agency chose to review.  Accordingly, the Court finds that Commerce's decision not to

consider data submitted by Plaintiffs in the calculation of antidumping margins for non-selected respondents is reasonable and supported by substantial evidence.

**III. Commerce's Decision Not to Incorporate the Zero and De minimis Rates Of the Mandatory Respondents Into the Average Rate Assigned to the Non-selected Respondents Is Not Arbitrary, Capricious or An Abuse of Discretion**

In the case at bar, Commerce exercised its statutory prerogative to limit the number of company-specific margins it would assign. In such cases, 19 U.S.C. § 1673d(c)(1)(B)(i)(II) specifies that Commerce shall "determine, in accordance with paragraph (5), the estimated all-others rate for all exporters and producers not individually investigated." Paragraph 5 of that section establishes the method for determining the estimated all-others rate.

> [T]he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e [facts available].

19 U.S.C. §1673d(c)(5)(A). After investigating the three mandatory respondents, Commerce calculated the all-others rate for non-selected respondents by using the methodology set forth in

paragraph 5.[13]  <u>See</u> Issues and Decision Memorandum at 25, cmt. 8 (PR 211).  This resulted in the assignment of a dumping margin of 4.22 percent for the non-selected respondents.

Plaintiffs challenge Commerce's exclusion of zero and <u>de minimis</u> antidumping margins in the calculation of the margins assigned to non-selected respondents, arguing that the statutory all-others methodology is applicable only to investigations, and therefore is not appropriate for use in administrative reviews. <u>See</u> Pls.' Brief at 17.  Plaintiffs aver that "Congress' decision to limit this methodology to investigations - where only estimated duty deposits and not final antidumping duties are at issue - was intentional, and reflected a codification of past Commerce practice."  <u>Id.</u>  In support of this argument, Plaintiffs point to this Court's decision in <u>Serampore Indus. Pvt. Ltd. v. United States</u>, 12 CIT 825, 696 F. Supp. 665 (1988).  Plaintiffs claim that the reasons provided by Commerce in <u>Serampore</u>, for excluding zero and <u>de minimis</u> margins from the all-others rate in antidumping investigations, do not apply to this administrative review.  <u>See</u> Pls.' Brief at 19.  While the Court agrees with Plaintiffs' analysis of Commerce's rationale in <u>Serampore</u>, the underlying principles of this rationale have been superceded by more recent

_____

[13]  As previously noted, the three mandatory respondents, Haimeng, Winhere and Meita each received dumping margins of 4.22 percent, 0.03 percent and 0.00 percent respectively.

enactments to the antidumping statute.  Because this case pre-dates the amendments to the URAA, provisions relevant to the case at bar were not yet codified by Congress.[14]  For example, the provisions relating to voluntary respondents (section 1677m(a)), the exception allowing Commerce to limit the number of respondents chosen for review (section 1677f-1(c)), and  the method for determining the all-others rate (section 1673d(c)(5)) had not yet been adopted. The absence of these statutory provisions means that the Court's analysis in <u>Serampore</u> was confined to Commerce's rationale without the benefit of any statutory guidance.  In other words, <u>Serampore</u> was decided in the context of Commerce's construction and application of the antidumping statute as it existed at that time. The Court's analysis today, however, must seek to determine whether Commerce's interpretation and application of these specific provisions are reasonable and in accordance with law by applying the two-step analysis prescribed in <u>Chevron</u>.  Thus, <u>Serampore</u> does not advance Plaintiffs argument.

     Commerce defends its position by arguing that the "practice of employing an 'all others' methodology in non-market economy administrative reviews was lawful and consistent with prior practice."  Def.'s Brief at 20.  Although there are no cases

---

     [14]  The trade agreements contained in the URAA were enacted by Congress on September 27, 1994. <u>See</u> SAA, H.R. 5110 (H. Doc. No. 103-316) (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040.

directly on point,[15] Commerce relies on  Certain Fresh Cut Flowers from Colombia: Final Results of Antidumping Duty [Tenth] Administrative Review, 63 Fed. Reg. 31,724 (Dep't of Commerce June 10, 1998) ("Certain Fresh Cut Flowers"), and Certain Fresh Cut Flowers from Colombia; Final Results of Antidumping Duty [Ninth] Administrative Review, 62 Fed. Reg. 53,287 (Dep't of Commerce Oct. 14, 1997).  Id. at 19.  All parties agree that, unlike antidumping investigations, there is no over-arching rule in administrative reviews as to the inclusion or exclusion of zero or de minimis margins in the calculation of the all-others rate.  See Def.'s Brief at 20; see also Trade Pacific Respondents Case Brief, May 21, 2007 at 21 (CR 11).  While section 1677f-1(c)(2) provides Commerce with the authority to determine margins by limiting its examination to a statistically valid sample of exporters or the largest volume exporters of subject merchandise, it is silent as to the method for establishing the rate for non-selected respondents.  Having established an ambiguity in the statute, Commerce's generally conferred authority permits the agency to address the uncertainty. See United States v. Mead, 533 U.S. 218, 229 (2001).  Thus, the Court's focus turns to the second step under Chevron.

---

[15]  Commerce submits Kaiyuan Group Corp. v. United States, 28 CIT 698, 343 F. Supp. 2d 1289 (2004) suggesting that this Court affirmed the use of the all-others rate in NME administrative reviews. While there does appear to be some recognition of this practice, the Court did not specifically rule on this issue and its comments were confined to dicta.

A reviewing court "is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable." Id. at 229. This Court's decision in Coalition for the Pres. of Am. Brake Drum and Rotor Aftermkt. Mfrs. v. United States, 23 CIT 88, 44 F. Supp. 2d 229 (1999) ("Coalition") is instructive in this regard. In Coalition, the court affirmed Commerce's extension of an all-others rate to NME investigations explaining that the amended provisions of the antidumping statute "indicate Congressional support for the 'all-others' rate without distinction for NME or non-NME contexts." Coalition, 23 CIT at 110, 44 F. Supp. 2d 229, 250 (citing UCF America Inc. v. United States, 919 F. Supp. 435, 441 (1996)). Similarly, the legislative history indicates Congressional support for the applicability of an all-others rate in both administrative reviews and investigations.[16]   Thus, Commerce's approach also comports with the statutory scheme under the URAA as articulated by Congress.

Plaintiffs further argue that "Commerce's decision to extend

---

[16]  The operative language in the SAA provides that "[u]nder existing practice, Commerce attempts to calculate individual dumping margins for all producers and exporters . . . who are subject to an antidumping investigation or for whom an administrative review is requested. . . . Commerce will calculate individual dumping margins for those firms selected for examination and an 'all others' rate to be applied to those firms not selected for examination." SAA  H.R. 5110 (H.R. Doc. No. 103-316) at 872.

to administrative reviews its approach of excluding zero and <u>de</u> <u>minimis</u> rates from the calculation of the average rate assigned to non-selected respondents . . . leads to absurd and arbitrary antidumping results." Pls.' Brief at 20. For illustrative purposes, Plaintiffs offer a scenario in which mandatory respondents Meita and Winhere each receive antidumping rates slightly above the <u>de</u> <u>minimis</u> threshold. Under the express language of the statute, these rates would now be included in the average rate calculation. Thus, an increase in the mandatory respondents level of dumping would have actually resulted in a lower average rate assigned to the non-selected respondents. This incongruity, according to Plaintiffs, demonstrates the arbitrary nature of Commerce's decision to exclude zero and <u>de</u> <u>minimis</u> rates from their calculation of the all-others rate. Plaintiffs maintain that "there is no reason why an antidumping margin of 0.51 percent should be included and an antidumping margin of 0.49 percent be excluded from the calculation of the average rate assigned to non-selected respondents." Pls.' Brief at 20-21. While it is true that under certain circumstances a mandatory respondent's increased level of dumping may actually reduce the rate assigned to a non-selected respondent, this is an inherent and accepted part of any sampling methodology. By its nature a sampling rate cannot attain the precision of an individualized rate as to any given party. Therefore, Plaintiffs argument is more appropriately directed at

the legislature.  The exclusion of zero and de minimis margins in section 1673d(c)(5)(A) is an assignation by Congress not Commerce.

The scope of review under the abuse of discretion standard is a narrow one, and a reviewing court will afford considerable deference to an agency decision. See Consolidated Fibers, Inc. v. United States, 535 F. Supp. 2d 1345, 1354 (2008) ("[T]his standard is generally considered to be the most deferential of the APA standards of review.")  In the present case, there is no question that Commerce had the authority to choose the method for calculating the rates for non-selected respondents.  The only issue here is whether the agency's discharge of that authority was reasonable.  "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." Star Fruits S.N.C. v. United States, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

Here, all Commerce did was adopt an approach that parallels the statutorily mandated formula for calculating the all-others rate in NME investigations.  See 19 U.S.C. §1677d(c)(5).  The agency conducted a review of past practice and determined that the conditions present in the underlying proceeding were most analogous to those extant in NME investigations.  Noting that the touchstone of the abuse of discretion standard is "rationality," Hyundai

Elecs. Indus. Co. v. ITC, 899 F.2d 1204, 1209 (Fed. Cir. 1990), the Court finds that Commerce's decision to conform its methodology to the statutory norm is not arbitrary, capricious or an abuse of discretion.

## IV.  Commerce's Valuation Of Pig Iron Is Unsupported By Substantial Evidence And Not In Accordance With Law

In an antidumping investigation, Commerce calculates a dumping margin by determining the amount by which the "normal value" of the imported merchandise exceeds the "export price" for that same merchandise.  19 U.S.C. § 1677(35)(A).  Whereas normal value typically equals the domestic price of the product in the exporting country, id. § 1677b(a)(1)(B), the export price generally refers to the price at which the subject merchandise is first sold by the producer or exporter before importation into the United States. Id. § 1677a(a).  When the subject merchandise is exported from a NME, however, the domestic sales may not be reliable indicators of market value.  In such instances, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expense." Id. § 1677b(c)(1).  In valuing the factors of production under this section, Commerce "shall utilize, to the extent possible, the

prices or costs of factors of production in one or more market
economy countries that are- (A) at a level of economic development
comparable to that of the nonmarket economy country, and (B)
significant producers of comparable merchandise." Id. §
1677b(c)(4).  The statute requires Commerce to base its valuation
of the factors of production on the "best available information
regarding the values of such factors in a market economy country or
countries considered appropriate by the administering authority."
Id. § 1677b(c)(1).

    In the underlying review, Commerce relied on publicly
available Indian surrogate values for each input. See Def.'s Brief
at 25.  With respect to pig iron, the agency used Indian import
statistics obtained from the World Trade Atlas ("WTA"), "a
published data source that tracks global imports and exports."[17]
Id.  Commerce selected the Harmonized Tariff System ("HTS")
category 7201.1000 as the product most similar to the reported type
of pig iron used by respondents.  See Issues and Decision
Memorandum at 6, cmt. 1 (PR 211).  This subheading covers non-alloy
pig iron with a phosphorous content of less than or equal to 0.5
percent.  Id.

---

        [17]  The World Trade Atlas is a database of commodities using
all levels of the Harmonized Tariff Schedule. It enables users to
determine the value of a specific product and identify countries
to or from which the product is being exported or imported. See
http://www.gtis.com/wta.htm.

Plaintiffs contest Commerce's reliance on the WTA data as unsupported by substantial evidence and contrary to law. <u>See</u> Pls.' Brief at 21.  Instead, Plaintiffs aver, that Commerce should have used the financial statements of Indian steel producer, Steel Authority of India Limited ("SAIL") as the basis for valuing Plaintiffs' pig iron consumption.  <u>See</u> Pls.' Brief at 33. Plaintiffs' characterize the central issue as several sub-issues, namely that there is record evidence which indicates that the imported pig iron was 1) not specific to the pig iron used in the production of subject merchandise, 2) was not imported in commercially significant quantities, and 3) was not consumed by the Indian brake rotor casting industry.  <u>See</u> <u>id.</u> at 22.  Because the Court's holding is premised on the first of these arguments, Plaintiffs alternate arguments need not be addressed.

Plaintiffs claim that "approximately seventy percent of the pig iron imported into India during the POR was Sorelmetal, a high-purity, ductile iron that is not used, and cannot be used, to produce the subject merchandise."  <u>See</u> Pls.' Brief at 25.  This claim is premised on evidence Plaintiffs submitted which indicates that the entirety of Indian imports from South Africa,[18] under HTS 7201.1000, were of Sorelmetal an ingredient in the manufacture of

---

[18]  Plaintiffs rely on Infodrive India ("Infodrive"), which is a database of Indian export-import activity, that provides line-by-line data on the physical characteristics of the precise goods listed under HTS 7201.1000.

ductile iron.  It was these imports that accounted for close to seventy percent of the total pig iron imports into India.  <u>See</u> Surrogate Value Submission for the Final Results, Exhibits 1, 2 (March 28, 2007) (PR 193).  According to Plaintiffs, the underlying antidumping duty order is limited to "brake rotors made of gray cast iron," and that ductile iron brake rotors are not subject to that order.  Pls.' Brief at 26; <u>see also</u> <u>Final Results</u>, 72 Fed. Reg. 42,386 (August 2, 2007) (PR 217).  Thus, Plaintiffs argue that Commerce erred in its determination that Indian pig iron imports are specific to the gray pig iron Plaintiffs use to produce the subject merchandise.  <u>See</u> Pls.' Brief at 26.

In defense of its position, Commerce simply states that "as demonstrated above, the respondents failed to place anything on the record of the review that indicated that Sorelmetal is different from the pig iron used by respondents." Def.'s Brief at 30. Commerce's only other statement in this regard is that it "found that the imports from South Africa (those comprised primarily of Sorelmetal) had the same range of average unit values as those from all of the other six countries in the WTA data."[19]  <u>Id.</u>  Although the antidumping statute does not define the phrase "best available information" this Court has previously held that "the statute

---

[19]  Throughout this portion of the argument, Commerce cites to its Issues and Decision Memorandum as support for its position. While this may be instructive in certain respects, it does not provide a legal basis for the agency's decision.

grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 25 CIT 939, 944, 166 F. Supp. 2d 608, 616 (2001); see also Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of the factors of production in the application of those guidelines."). To assist it in the calculation of normal value of subject merchandise from nonmarket economy countries, Commerce "normally will use publicly available information to value factors [of production]." 19 C.F.R. § 351.408(c)(1). In addition, Commerce has developed policy preferences in the selection of data for valuation purposes.[20] See Issues and Decision Memorandum at 6, cmt. 1 (PR 211).

Commerce explains that the WTA data "was the best available data to value pig iron because it was contemporaneous with the period of review, specific to the raw material (defined as pig iron containing less than or equal to 0.5 percent phosphorous) consumed by the respondents in the production of subject merchandise."

---

[20] These preferences include surrogate values that are (1) non-export average values; (2) contemporaneous with the period being examined; (3) product-specific; and (4) tax exclusive. See Notice of Final Determination of Sales at Less Than Fair Value: Bicycles From the People's Republic of China, 61 Fed. Reg. 19,026 (April 30, 1996).

Def.'s Brief at 27 (internal quotation marks omitted).  Commerce further explains its selection of HTS category 7201.1000 "as the product most similar to the reported type of pig iron used by respondents based on respondents' questionnaire responses indicating that they used pig iron with a phosphorous content of less than or equal to 0.5 percent in the production of subject merchandise."  Issues and Decision Memorandum at 6, cmt 1 (PR 211). Hence, the question for the Court is whether Sorelmetal is specific to the pig iron being used in the production of subject merchandise.  The record evidence indicates that Sorelmetal is an ingredient in the composition of ductile iron.[21]  See Surrogate Value Submission for the Final Results, Exhibit 4 (March 28, 2007) (PR 193)  While the Court agrees with Plaintiffs that ductile iron is dissimilar to the type of pig iron used by respondents, the issue is whether Sorelmetal differs in some material way from pig iron so as to preclude its use in the manufacture of subject merchandise.  The evidence Plaintiffs submit makes clear that Sorelmetal is designed, manufactured and marketed for the express purpose of producing a higher grade of ductile iron.  See id.  Its low concentration of certain undesirable elements (i.e., carbon)

---

[21]  Ductile iron is one of several commercial grades of cast iron. Cast iron is a generic term describing a family of iron alloys containing 1.8-4.5 percent carbon. See 3 McGraw-Hill Encyclopedia of Science and Technology, 547 (9th ed. 2002). Other forms include gray iron, white iron, and malleable iron each with various applications. See id.

allow it a higher ductility, a quality especially desirable in ductile iron.  <u>See</u> <u>id.</u>  Pig iron, on the other hand, has a relatively high content of carbon, thus making it very brittle, and not useful directly except for limited applications.  <u>See</u> <u>The Making, Shaping and Treating of Steel</u> 1, 1066-68 (9th ed. 1971). The central of these applications is as an ingredient of cast iron. <u>See</u> <u>id.</u> at 1066.

The Court agrees with Plaintiffs that "although the phosphorous content of pig iron may be the defining characteristic in the Indian HTS category, it is not the defining characteristic of the pig iron that Plaintiffs consumed."  Pls.' Brief at 27. While the Indian HTS classification is the mechanism by which Commerce attempts to assign a surrogate value for any given input, the underlying rationale is to achieve the statutory objective of assigning dumping margins "as accurately as possible." <u>Lasko Metal Prods. Inc. v. United States</u>, 43 F.3d 1442, 1446 (Fed. Cir. 1994). Should this practice somehow produce less accurate results, Commerce's use of this information may be deemed unreasonable.  <u>See</u> <u>Lasko Metal Prods. Inc. v. United States</u>, 16 CIT 1079, 1081, 810 F. Supp. 314, 317 (1992).  The evidence that Plaintiffs cite weakens Commerce's determination as to the representativeness of the data the agency relied on.  Commerce does not rejoin Plaintiffs' argument that Sorelmetal is a product different from the subject pig iron other than to compare its average unit value with other

WTA countries.  See Def.'s Brief at 30.  This does not address the
question of whether or not the pig iron imports into India, under
HTS 7201.1000, are consistent with the pig iron consumed by
Plaintiffs.  Therefore, the Court finds that Commerce failed to
adequately explain whether the Indian imports under HTS 7201.1000
are the best available information for valuing pig iron consumed by
the Plaintiffs in the production of subject merchandise.  In light
of the record evidence indicating that Sorelmetal is a product
fundamentally different from the pig iron consumed by Plaintiffs,
Commerce's use of the WTA data fails the criteria it adopted in
Notice of Final Determination of Sales at Less Than Fair Value:
Bicycles From the People's Republic of China, 61 Fed. Reg. 19,026
(Dep't of Commerce April 30, 1996) for valuing factors of
production.  Namely, that the data be product-specific.
Accordingly, the Court finds that Commerce's determination that the
WTA data constituted the best available information for valuing pig
iron was unsupported by substantial evidence on the record.

     Alternatively, Plaintiffs argue that the data contained in the
audited financial statement of SAIL more accurately represents the
pig iron consumed by respondents.  See Pls.' Brief at 24.  This
Court has stated previously that "Commerce need not prove that its
methodology was the only way or even the best way to calculate
surrogate values for factors of production as long as it was a
reasonable way."  Coalition, 23 CIT at 118, 44 F. Supp. 2d 229,

258.  In the present case, while Commerce adequately detailed the numerous reasons why the SAIL data was not preferable, the agency failed to explain its reliance on the WTA data as reasonable. Commerce explained, for instance, that the SAIL financial statement only provides information regarding sales of pig iron without reference to the phosphorous content of the merchandise.  See Issues and Decision Memorandum at 8, cmt 1 (PR 211).  Therefore, the information in the SAIL financial statement was not verifiable as to product specificity.  In addition, Commerce points to the fact that the SAIL data did not reflect whether the company received subsidies or whether it purchased raw materials from NME suppliers.  See id.  Lastly, Commerce notes that the WTA data reflects a broader overall more representative data source as opposed to the financial statement of just one company. See Def.'s Brief at 29.

The Court therefore remands back to Commerce to specifically address (i) Plaintiffs' argument that Sorelmetal is fundamentally different from the pig iron consumed by respondents and cannot be used in the production of subject brake rotors; or alternately (ii) whether pig iron imports into India under HTS 7201.1000 are the best available information for valuing the pig iron consumed by Plaintiffs in the production of subject brake rotors.

## CONCLUSION

In accordance with the foregoing, the Court affirms Commerce's determination in part and remands in part.


                                    _____/s/ Nicholas Tsoucalas_____
                                    **NICHOLAS TSOUCALAS**
                                    **SENIOR JUDGE**


Dated:     October 21, 2008
           New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**

Before: Nicholas Tsoucalas, Senior Judge

```
_____
LONGKOU HAIMENG MACHINERY CO., LTD.,   :
LAIZHOU AUTO BRAKE EQUIPMENT COMPANY,  :
LAIZHOU HONGDA AUTO REPLACEMENT        :
PARTS CO., LTD.,                       :
LAIZHOU LUQI MACHINERY CO., LTD.,      :
QINGDAO GREN (GROUP) CO., and          :
LONGKOU TLC MACHINERY CO., LTD.,       :
                                       :
          Plaintiffs,                  : Consolidated
                                       : Court No.:  07-00321
                                       :
          v.                           :
                                       :
UNITED STATES OF AMERICA,              :
                                       :
          Defendant,                   :
                                       :
          and                          :
                                       :
COALITION FOR THE PRESERVATION OF      :
AMERICAN BRAKE DRUM AND ROTOR          :
AFTERMARKET MANUFACTURERS              :
                                       :
          Defendant-Intervenor.        :
_____   :
```

October 21, 2008


**ORDER**


     This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby


     **ORDERED** that Plaintiffs' Longkou Haimeng Machinery Co., Ltd.; Laizhou Auto Brake Equipment Company; Laizhou Hongda Auto Replacement Parts Co., Ltd.; Laizhou Luqi Machinery Co., Ltd.; Qingdao Gren (Group) Co., and Longkou TLC Machinery Co., Ltd (collectively "Plaintiffs") USCIT R. 56.2 Motion for Judgment Upon the Agency Record is granted in part and denied in part; and it is further

**ORDERED** that the Department of Commerce's final determination in <u>Brake Rotors From the People's Republic of China: Final Results of Antidumping Duty Administrative and New Shipper Reviews and Partial Rescission of the 2005-2006 Administrative Review</u> ("Final Results"), 72 Fed. Reg. 42,386 (Aug. 2, 2007) is remanded back to Commerce; and it is further

**ORDERED** that Commerce explain whether Sorelmetal is fundamentally different from the pig iron consumed by Plaintiffs in the production of subject brake rotors, or alternatively whether pig iron imports into India under HTS 7201.1000 are the best available information for valuing the pig iron consumed by Plaintiffs in the production of subject brake rotors; and it is further

**ORDERED** that all remaining issues are affirmed; and it is further

**ORDERED** that the remand results are due within ninety (90) days from the date that this opinion is entered.  Any responses or comments are due within thirty (30) days thereafter.  Any rebuttal comments are due within fifteen (15) days after the date the responses or comments are due.


                                /s/ Nicholas Tsoucalas
                              **NICHOLAS TSOUCALAS**
                                **SENIOR JUDGE**


Dated:      October 21, 2008
            New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____         By: _____
                                                             Deputy Clerk